

# Health Advantage

An Independent Licensee of the Blue Cross and Blue Shield Association

HMO Partners, Inc.
d/b/a Health Advantage
320 West Capitol Avenue
Little Rock, Arkansas 72201
(501) 378-2363
(800) 843-1329

## GROUP ENROLLMENT CONTRACT

Health Advantage agrees to provide to the Subscribers of the Group, and their covered Dependents, the benefits set forth in the Evidence of Coverage, attached to and incorporated as part of this Group Enrollment Contract in accordance with the terms, provisions and limitations of this Contract.

This Contract is issued in consideration of the Group's application, a copy of which is attached, the Group's Covenants set forth in this Contract, and the Group's payment of the premium.

This Contract becomes effective at 12:01 a.m. on the Effective Date shown on the Group Application. The Contract is renewable month to month, by payment of the monthly premium. The premium for the Contract may be adjusted upon 30 days notice. The Contract is subject to termination according to its terms.

The following pages, including the Evidence of Coverage, the Group Application, the Enrollment Application, any Change Forms and any attachments, riders, endorsements or amendments are part of this Group Enrollment Contract.

It is signed at our Home Office on the Effective Date.

_Dail Bulger_
President

# TABLE OF CONTENTS

|     |                         | PAGE     |
|-----|-------------------------|----------|
| 1.0 | DEFINITIONS             | 3        |
| 2.0 | COVENANTS OF THE GROUP  | 4        |
| 3.0 | CLAIMS                  | 8        |
| 4.0 | GENERAL PROVISIONS      | 9        |
|     | GROUP APPLICATION       | ATTACHED |
|     | EVIDENCE OF COVERAGE    | ATTACHED |

## 1.0 DEFINITIONS

1.1. **"Application" or "Group Application"** means the Large Employer Application & Participation Agreement that is executed by the Group.

1.2. **"Child"** means a Subscriber's natural Child, legally adopted Child or Stepchild. "Child" also means a Child that has been placed with the Subscriber for adoption. "Child" also means a Child for whom the Employer must provide medical support under a qualified medical child support order or for whom the Subscriber has been appointed the legal guardian.

1.3. **"Contract or Group Contract"** means this document together with the Application, Evidence(s) of Coverage, riders and amendments that are incorporated as part of this Group Contract.

1.4. **"Contract Month"** means a month commencing on the first day of the calendar month and expiring on the last day of the calendar month or commencing on the fifteenth day of the month and expiring on the fourteenth day of the following month, depending upon the billing cycle applied by Health Advantage.

1.5. **"Dependent"** means any member of a Subscriber's family who meets the eligibility requirements of the Plan as set out in the Evidence of Coverage, who is enrolled in the Plan, and for whom Health Advantage receives a premium.

1.6. **"Employer"** means a sole proprietorship, partnership, or corporation which is the Group.

1.7. **"Evidence of Coverage"** means a document containing a description of the benefits provided by the Group Contract.

1.8. **"Grace Period"** means the period of 30 consecutive days beginning with any premium due date after the first which shall be allowed for payment of premium.

1.9. **"Group"** means the Employer as shown in the Application.

1.10. **"Health Advantage"** means HMO Partners, Inc., doing business as Health Advantage.

1.11. **"Member"** means a Subscriber or Dependent who is covered under this Group Contract.

1.12. **"Open Enrollment Period"** means the period annually, that is designated by the Employer and set forth in the Application, when employees who are eligible for coverage may enroll in the Plan. During the Open Enrollment Period, Subscribers covered by the Plan may change their coverage, and that of their Dependents. Unless otherwise designated in this Group Contract, enrollments and coverage changes made during the Open Enrollment Period become effective on the anniversary date of the Group Contract. If for any reason, Employer fails to designate an Open Enrollment Period, or the Application fails to indicate it, the Open Enrollment Period shall be the month prior to the anniversary of the effective date of this Group Contract.

1.13. **"Plan"** means the Employee Health Benefit Plan established by the Group. The terms of the Plan are set forth in this Group Contract.

1.14. **"Plan Administrator"** means the Employer.

1.15. **"Plan Year"** means the Plan Year stated in the Employee Health Benefit Plan Summary Plan Description, or if not stated in that document, or if that document does not exist, the twelve month period ending on the day before the anniversary date of the effective date of this Group Contract.

1.16. **"Spouse"** means a member of the opposite sex who is the husband or wife of a Subscriber as a result of a marriage that is legally recognized in the state of Arkansas

1.17. **"Subscriber"** means a person who is directly employed by the Employer for 30 hours or more each week and 48 weeks or more each year. This person must reside in the United States and be paid for full-time work in the conduct of the Employer's regular business. No director or officer of the Employer shall be considered a Subscriber unless he meets the above conditions.

## 2.0 COVENANTS OF THE GROUP

As part of the consideration for this Contract, Group understands, acknowledges and agrees:

2.1. **Plan Administrator.** The Group is the Plan Administrator of the Employee Health Benefit Plan ("Plan"), the terms of which are set forth in this Contract. The Group gives Health Advantage authority and full discretion to audit the Group's records relating to this Contract and to determine all questions arising in connection with the Plan benefits, including but not limited to eligibility, interpretation of Plan language, and findings of fact with regard to any such questions. The actions, determinations and interpretations of Health Advantage acting on behalf of the Plan within the scope of this authority shall be conclusive and binding on the Group and the Member, subject to the Appeal Procedure set out in Section 7.0 of the Evidence of Coverage.

2.2. **On-line Electronic Enrollment**
  1. Group has selected an on-line electronic enrollment process for use with this Contract.
  2. Group shall verify the accuracy of information submitted on Subscriber applications and change forms and assure this information is transmitted to Health Advantage.
  3. Applications and changes in coverage must be communicated to Health Advantage in a timely manner in the format required by Health Advantage in order to be effective. Health Advantage shall not be responsible for any applications or changes in coverage or errors in such applications or changes if proper procedures as required by Health Advantage are not followed. Health Advantage shall be entitled to rely upon any data submitted by a Subscriber or Group in on-line format.
  4. Group shall obtain and maintain the documents described in this Contract at Subsection 2.7 to support eligibility status of Subscribers and Dependents. Group shall provide these documents to Health Advantage upon request.
  5. **The Group shall indemnify Health Advantage for any claims Health Advantage erroneously pays or any damages Health Advantage incurs as a result of the Group failing to provide timely, accurate information to Health Advantage of a change in the eligibility status of a Subscriber or Dependent, or failing to provide to Health Advantage the documents required by this Contract to support the eligibility status of Subscribers or Dependents.**

2.3. **Subscriber Participation.** Unless this Contract is provided as a second health plan for the Group, the Group shall assure that the percentage of eligible Subscribers of the Group covered by this Contract shall not be less than the percentage of the Subscriber participation specified in the Group Application and the number of Subscribers covered by this Contract shall not be less than the minimum number specified in the Group Application.

2.4. **Payment of Premium.** The Group shall pay Health Advantage the premiums for covered Subscribers and Dependents every month, in advance. Payment of premium is due on the first day of the month or the fifteenth day of the month, depending upon the billing cycle established by Health Advantage for the Policy. "Pay," "Paid" or "Payment," when used here in reference to premium, premium due dates or the Grace Period shall mean that the full amount of all funds due actually received by Health Advantage at its principal offices in Little Rock, Arkansas. Placing a check into the U.S. mail or with any courier service shall not constitute payment under this Policy unless or until the check is actually received by Health Advantage at its principal office. Nor shall any invalid or dishonored check constitute payment.

2.5. **Equal Contributions.** The Group agrees to contribute toward the cost of the Health Advantage premium an amount no less than the amount contributed toward any other health plan offered by the Group, up to the total cost of the Health Advantage premium.

2.6. **Employer Contributions.** The Group agrees to contribute toward the cost of the Health Advantage premium an amount no less than 50% of the total monthly premium for the Subscribers.

2.7. **Documentation of Member Eligibility and Effective Dates of Coverage.** The provisions of the Plan outlining eligibility and effective dates of coverage for Members are set out in the Evidence of Coverage. In order to support these provisions, Group agrees:
   1. If a Subscriber marries and wishes to have the Subscriber's Spouse covered, Group shall obtain and maintain a copy of the marriage certificate and make this document available to Health Advantage upon request.
   2. If a Subscriber wants coverage for a newborn Child, if either the Subscriber is unmarried or the name of the Child is different from that of the Subscriber, Group shall obtain and maintain a copy of the birth certificate and make this document available to Health Advantage upon request.
   3. If a Subscriber wants coverage for an adopted Child, Group shall obtain and maintain a copy of the petition for adoption or adoption papers and make this document available to Health Advantage upon request.
   4. If Qualified Medical Child Support Order is issued to an employee of the Group, Group shall obtain and maintain a copy of the court order and make this document available to Health Advantage upon request.
   5. If a Subscriber' Spouse requests continuation of coverage under federal or state law as a result of divorces or legal separation, Group shall obtain and maintain a copy of the divorce decree or legal separation papers and make these documents available to Health Advantage upon request.
   6. If Group fails to provide any document described in this Subsection 2.7., Health Advantage, at its sole discretion, may rescind the coverage of the Member(s) for whom such document established eligibility, and Group shall reimburse Health Advantage for any claims, costs or damages that resulted from such coverage.

2.8. **COBRA.** If COBRA applies to the Plan, the Group, as Plan Administrator, must provide its Subscribers and their Dependents notice of COBRA rights at the time their coverage commences under this Contract and must notify the Subscriber or Dependent of his right to elect continuation of coverage under COBRA within fourteen (14) days of the happening of a "qualifying event" under COBRA. **Health Advantage shall not assume the Group's obligation to provide benefits under COBRA if the Group fails to provide these notices at the times specified in this Contract nor shall Health Advantage be responsible for providing any COBRA notices to Subscribers or Dependents.**

2.9. **HIPAA PORTABILITY.** The Group, as Plan Administrator, is legally obligated, along with Health Advantage, to comply with the provisions of the Health Insurance Portability and Accountability Act of 1996, ("HIPAA"). The Group shall cooperate with Health Advantage to assure information concerning prior health insurance coverage of individuals, both Subscribers and Dependents, is communicated to Health Advantage when such individuals are enrolled. The Group shall assist Health Advantage in providing Certificates of Creditable Coverage to Members, both Subscribers and Dependents, who terminate their coverage under this Contract, in accordance with the provisions of HIPAA. The Group agrees to indemnify and hold Health Advantage harmless if any action or inaction of the Group results in Health Advantage being charged with or sued for violating HIPAA.

2.10. **HIPAA PRIVACY**

**Restrictions on the Use or Disclosure of Protected Health Information ("PHI").** Group (herein referred to as Employer) hereby agrees to the following restrictions on Employer's use of, access to or disclosure of PHI of Plan participants:
   1. Employer may use or disclose PHI only for Plan administrative purposes, as required by law, or as permitted under the HIPAA Privacy Rules; and
   2. If Employer discloses PHI to any agents or subcontractors, Employer shall first require the agents or subcontractors to agree to the same restrictions on use and disclosure of PHI as the Employer has agreed to herein; and

5

3. Employer shall not use or disclose PHI for employment-related actions or decisions or in connection with any other benefit or benefit plan of Employer; and

4. Employer will promptly report to the Plan (through the Firewall Department, as designated below) any use or disclosure of PHI by Employer or within Employer's organization that is inconsistent with the uses or disclosures allowed under this Subsection 2.10; and

5. Employer shall allow Plan participants to inspect and copy any PHI related to the Plan participant that is in a designated record set in Employer's custody and control, as permitted or required by the HIPAA Privacy Rules, subject to certain exceptions recognized in the Rules; and

6. Employer shall amend, or allow the Plan or Health Advantage as insurer of the Plan, to amend, any portion of a Plan participant's PHI, to the extent permitted or required under the HIPAA Privacy Rules; and

7. If Employer makes some types of disclosures of PHI for purposes other than payment or health care operations, Employer will make available such information as is required under the Rules to render an accounting to the Plan participant of such disclosures. Consistent with the Rules, Employer shall not be obligated to provide information for an accounting if disclosures are for certain Plan related purposes, such as payment of benefits or health care operations, or if the Plan participant authorized the disclosures; and

8. Employer shall make its internal practices, books, and records, relating to its use and disclosure of PHI of Plan participants available to the U.S. Department of Health and Human Services upon its request; and

9. Employer shall, if feasible, return or destroy all PHI of Plan participants in Employer's custody or control that Employer has received from the Plan (through the Firewall Department, as designated below) when Employer no longer needs such PHI to administer the Plan. If it is not feasible for Employer to return or destroy PHI, Employer will limit the use or disclosure of any PHI that it cannot feasibly return or destroy to those purposes that make return or destruction of the information infeasible; and

10. Employer shall require that all employees or classes of employees included within the Firewall Department designation, as set forth below, must limit their access to and use of any PHI of Plan participants to activities required or needed for proper administration of the Plan and Plan benefits. Employer shall take appropriate steps to discipline including, where appropriate, termination of any employee who violates the requirements of this Subsection 2.9.

**Designation of Firewall Department.**

The following classes of employees or other workforce members under the control of Employer (sometimes referred to as the "Firewall Department" for HIPAA Privacy Rules purposes) are hereby designated in accordance with HIPAA Privacy Rules firewall provisions to be given access to PHI of Plan participants for the purposes set forth in this document:

> All employees or other workforce members under the control of Employer assigned to and working in the Human Resources Department or Division or the Employee Benefits Department or Division of Employer, or otherwise serving on a regular and routine basis to fulfill personnel or employee benefits administration functions for Employer, including but not limited to all employees whose job duties require communication and interaction with Health Advantage as insurer for the Plan, regarding any plan administration, claims or eligibility-related matters.

2.11. **Agent for Members**: The Group is the agent for the Subscribers and their Dependents in all dealings between Subscribers or Dependents and Health Advantage, including:

1. payment of premiums to Health Advantage;
2. notifying Health Advantage of changes in Subscriber or Dependent status;

6

3. securing and forwarding to Health Advantage applications for coverage of new Subscribers or new Dependents;

4. providing Subscribers and Dependents all communications and notices from Health Advantage.

2.12. **Contract with HMO Partners, Inc. d/b/a Health Advantage:** On behalf of Group and its subscribers or members, the Group acknowledges its understanding that this Contract constitutes a contract solely between the Group and HMO Partners, Inc. d/b/a Health Advantage, that HMO Partners, Inc. is an independent corporation operating under a license with the Blue Cross and Blue Shield Association, an association of independent Blue Cross and Blue Shield Plans, (the "Association") permitting HMO Partners, Inc. to use the Blue Cross and Blue Shield Service Marks in the State of Arkansas, and that HMO Partners, Inc. is not contracting as the agent of the Association. The Group further acknowledges and agrees that it has not entered into this Contract based upon representations by any person other than HMO Partners, Inc., and that no person, entity or organization other than HMO Partners, Inc. shall be held accountable or liable to Group for any of the obligations created under this Contract.

## 3.0 CLAIMS

3.1. **Claim Processing and Claim Appeal Procedures.**

Health Advantage shall process claims and conduct appeals in accordance with the claim processing and appeal procedures set out in the Evidence of Coverage.

3.2. **Facility of Payment**

1. Health Advantage may, at its option, pay all or any out-of-network benefits to the hospital, other institutions or the person giving medical services or supplies to the Member.

2. Any payment made according to the above paragraph shall discharge Health Advantage to the extent of any such payment. Health Advantage shall not be bound to see to the use of the money so paid.

3.3. **Legal Actions**

The Member may not initiate legal action with respect to a claim until the Member has exhausted his or her rights of appeal under the Plan. No legal action shall be brought after the expiration of three (3) years from the time that a claim is required to be submitted.

3.4. **Assignment**

No assignment of benefits under this policy shall be valid until approved and accepted by Health Advantage. Health Advantage reserves the right to make payment of benefits, in its sole discretion, directly to the provider of service or to the Member.

## 4.0 GENERAL PROVISIONS

4.1. **Entire Contract.** The entire contract is made up of this Group Contract, the Evidence of Coverage issued to Subscribers, the Group Application and any attachments, riders, endorsements or amendments. The application or change forms also become a part of this Contract. Identification Cards issued to Members are for convenient summary only and do not constitute part of this Contract of coverage. In the absence of fraud, all statements made by the Group or by persons covered are representations and not warranties. No such statement shall be used in any contest under this Contract unless it is contained in a written instrument and a copy of such instrument is or has been furnished to such person.

4.2. **Time Limit on Certain Defenses.** Except for failure to comply with the participation or contribution requirements, nonpayment of premium, or fraudulent statements, this Contract shall not be contested after it has been in force for two years. Statements made about a Member's eligibility, unless such statements are fraudulent, shall not be used to void coverage or deny a claim unless:

   1. the statements are contained in a written document signed by the Member; and
   2. the loss on which claim is based occurs within two (2) years following the date of the signed written document.

4.3. **Term of This Contract.** This Contract is renewable from Contract Month to Contract Month by payment of the premium. It shall remain in force until terminated in accordance with its terms.

4.4. **Changes to Contract.** Health Advantage reserves the right to amend this Contract, in which case the amendment shall be deemed an amendment to the Plan. The procedure for amendment to this Contract and the Plan shall be that Health Advantage shall give 30 days' written notice to the Group. The change shall go into effect 30 days after the notice is sent or on the date fixed in the notice, whichever is later.

   No agent or employee of Health Advantage may change or modify any benefit, term, condition, limitation or exclusion of this Contract. Any change or amendment must be in writing and signed by an officer of Health Advantage.

4.5. **Non-Assignment.** This Contract is not assignable to any other Group, person or entity.

4.6. **Waiver.** The failure of Health Advantage, Group, or a Member to enforce any provision of this Contract shall not be deemed or construed to be a waiver of the enforceability of such provision. Similarly, the failure to enforce any remedy arising from a default under the terms of this Contract shall not be deemed or be construed to be a waiver of such default.

4.7. **Changes in Premium Rates:** Health Advantage reserves the right to establish a revised schedule of premium payments on each renewal date of the Evidence of Coverage upon thirty (30) days written notice to the Group. If a change in the Evidence of Coverage is required by law or regulation which increases Health Advantage's risk under this Evidence of Coverage, Health Advantage reserves the right to change the schedule of premium payments upon twenty (20) days written notice to the Group.

4.8 **Premium Payments:** All premiums are payable at Health Advantage's Home Office. The Group must make the first premium payment on or before the date the coverage is scheduled to take effect. Future premiums are due and payable in advance.

4.9 **Misstatement of Age.** If the age or sex of a Member has been misstated and such misstatement requires a correction in the premium rate, premiums shall be adjusted to the premium rate for the correct age, and the difference in past premium paid shall be paid to or refunded by Health Advantage.

4.10 **Right of Rescission.** Material representation, misstatements, or omissions of information may be used by Health Advantage as the basis for rescission of coverage of the Group, any Subscriber or any Dependent.

4.11 **Grace Period.** Any premium for this coverage which is not paid on or before the date it becomes due is in default. After the first premium payment, the Group shall be allowed a 31 days grace

9

period. During the grace period, the coverage shall remain in force, but only if payment in full for the past due amount and any current monthly premium coming due during the Grace Period is received within the Grace Period. If such payment is not received on or before the 31st day of the Grace Period, all coverage shall terminate as of the date on which premium was due and payable, and no coverage shall be recognized or available during the Grace Period. Group shall be obligated to fully inform all Subscribers and Dependents of any delinquency and if Group fails to do so, if any Member incurs services during any Grace Period or delinquency which are not eligible for coverage because the coverage subsequently terminated for non payment of the full premium prior to the end of the Grace Period, Group shall be solely liable for payment for such incurred services and shall indemnify and hold Health Advantage harmless for any and all claims, damages, fines, penalties, losses, expenses, judgments, awards, settlements, punitive damages, attorneys' fees or costs of any kind which are incurred by Health Advantage as a result of any claim or lawsuit by a Member for such services. The Group is subject to a late premium payment charge equal to the Health Advantage cost of funds, which is set by the bank with which Health Advantage does business.

4.12 **Termination of This Contract**:

1. The Group may terminate this Contract on any premium due date by giving Health Advantage written notice of termination in advance of the premium due date. Any premiums paid beyond the requested termination date shall be refunded.

2. Health Advantage may terminate this Contract on any premium due date if:
   a. the premium due is not paid within the Grace Period;
   b. the percentage of eligible employees of the Group covered by the Contract becomes less than the percentage of employee participation specified in the Group Application, or if the number of Subscribers falls below the minimum number of Subscribers specified in the Group Application;
   c. the Group fails to contribute the agreed upon share of the premiums specified in the Group Application; or
   d. the Group performs an act or practice that constitutes fraud or makes an intentional misrepresentation of a material fact under the terms of the coverage.

3. Health Advantage may terminate this Contract upon giving the Group 90 days notice, in the event Health Advantage discontinues issuing this Contract form in the State of Arkansas. In such event Health Advantage shall offer the Group the option to purchase any other group health coverage currently being offered by Health Advantage in Arkansas.

4. When the Contract terminates, the Group is liable to Health Advantage for payment of all premiums and late charges which are due but unpaid at the time of termination or for reimbursement to Health Advantage for the costs of services rendered during the Grace Period, including but not limited to any and all claims, damages, fines, penalties, losses, expenses, judgments, awards, settlements, punitive damages, attorneys' fees or costs of any kind which are incurred by Health Advantage as a result of any claim or lawsuit a Member makes for services received during the Grace Period.

5. It is the duty of the Group, and not Health Advantage, to notify all affected Members that the Contract and their coverage is terminated. Health Advantage shall not be responsible under any circumstances to provide notices to any employee or other covered person of the status of premium payments, coverage or the lack of coverage under this Contract or the Plan.

6. If this Contract terminates, the Group shall not be eligible to reapply for another contract with Health Advantage for a period of six months from the date this Contract terminated.

4.13 **Refunds of Premiums**

If Health Advantage terminates the coverage of a Member, premium payments received on account of the terminated Member applicable to periods after the effective date of termination

shall be refunded to the Employer within 30 days, and Health Advantage shall have no further liability under this Group Contract.

If the Employer terminates coverage of a Member, the Employer must request Health Advantage refund premiums paid for such Member's coverage within 60 days from the effective date of termination of such coverage. Failure of the Employer to make a refund request within 60 days of the effective date of termination of the Member's coverage shall result in the Employer waiving refund of any premiums paid for such coverage. If claims have been paid past the termination date, the payment amount of the claims will be deducted from premium refunds.

### 4.14 Claim Recoveries.

There may be circumstances in which Health Advantage recovers amounts paid as claims expense from a provider of services, from a Member or from a third party. Such circumstances include rebates paid to Health Advantage by pharmaceutical manufacturers based upon amounts of claims paid by Health Advantage for certain specified pharmaceuticals, amounts recovered by Health Advantage from health care providers or pharmaceutical manufacturers through certain legal actions instituted by Health Advantage relating to the claims expense of more than one Member, recoveries by Health Advantage of overpayments made to health care providers or to Members, and recoveries from other parties with whom Health Advantage contracts or otherwise relies upon for payment or pricing of claims. The following rules govern Health Advantage's actions with respect to such recoveries:

1. In the event that such a recovery relates to a claim paid more than two years before the recovery, no adjustment will be made to any Deductible or Coinsurance paid by a Member and Health Advantage shall be entitled to retain such recoveries for its own use.

    If the recovery relates to a claim paid within two years and is not otherwise addressed in this subsection, Deductibles and Coinsurance amounts for a Member will be adjusted if affected by the recovery.

2. Only recoveries made within two years of the date of the error by Health Advantage or overpayments to health care providers or to Members by Health Advantage will be applied for the purpose of group rating or divisible surplus calculation, if applicable. The cost actually paid by Health Advantage to procure such recoveries will be treated as an administrative expense in considering group rating or divisible surplus, if applicable.

3. In the event Health Advantage receives from pharmaceutical manufacturers rebates based upon amounts of claims paid for certain specified pharmaceuticals, Health Advantage shall be entitled to retain such rebates for its own use, and no adjustments will be made to claims paid or to Deductibles or Coinsurance amounts paid by a Member.

4. If a Member is no longer covered by Health Advantage at the time of any such recovery, regardless of the amount or of the time of such recovery, Health Advantage shall be entitled to retain such recovery for its own use.

5. If such recovery amounts can not be attributed on an individual basis, because of having been paid as a lump sum settlement for less than the total amount of claims expense of Health Advantage or otherwise, no adjustments will be made to any Deductible or Coinsurance amounts paid by the Member and Health Advantage shall be entitled to retain such recovery for its own use.

### 4.15 Records and Reports.
The Group shall keep records and furnish information to Health Advantage upon request regarding:

1. Subscribers and their Dependents;
2. changes in Subscribers' coverage; and
3. termination of coverage.

### 4.16 Evidences of Coverage

Health Advantage shall provide the Contract Holder with Evidences of Coverage or booklets like the one which is incorporated into and made a part of this Contract. It is the obligation of the Contract Holder to distribute these Evidences of Coverage to each Member.

4.17 **ERISA Notices and Plan Documents.** Group, and not Health Advantage, shall be responsible, as Plan Administrator, for providing all ERISA notices and summary plan descriptions to Members.

4.18 **Sex and Number.** When used in this Contract, the masculine includes the feminine, the singular the plural, and the plural the singular.

4.19 **Conformity With Statutes.** If any provision does not comply with any law of the State of Arkansas, this Contract is deemed amended to meet the minimum requirements of the law, unless such law is pre-empted by federal law or found to be void by a court of competent jurisdiction, in which case any amendment to the Contract required by the pre-empted or voided law shall be deemed rescinded.

4.20 **Out of Service Area Services (BlueCard Program).** Like all Blue Cross and Blue Shield Licensees, Health Advantage participates in a program called "BlueCard." Whenever Members access health care services outside the geographic area Health Advantage serves, the claim for those services may be processed through BlueCard and presented to Health Advantage for payment in conformity with network access rules of the BlueCard Policies then in effect ("Policies"). Under BlueCard, when Members receive covered health care services within the geographic area served by an on-site Blue Cross and/or Blue Shield Licensee ("Host Blue"), Health Advantage will remain responsible to the Group for fulfilling its contract obligations. However, the Host Blue will only be responsible, in accordance with applicable BlueCard Policies, if any, for providing such services as contracting with its participating providers and handling all interactions with its participating providers. The financial terms of BlueCard are described generally below.

**Liability Calculation Method Per Claim.** The calculation of Member coinsurance liability on claims for covered health care services incurred outside the geographic area Health Advantage serves and processed through BlueCard will be based on the lower of the provider's billed charges or the negotiated price Health Advantage pays the Host Blue.

The methods employed by a Host Blue to determine a negotiated price will vary among Host Blues based on the terms of each Host Blue's provider contracts. The negotiated price paid to a Host Blue by Health Advantage on a claim for health care services processed through BlueCard may represent:

(i) the actual price paid on the claim by the Host Blue to the health care provider ("Actual Price"), or

(ii) an estimated price, determined by the Host Blue in accordance with BlueCard Policies, based on the Actual Price increased or reduced to reflect aggregate payments expected to result from settlements, withholds, any other contingent payment arrangements and non-claims transactions with all of the Host Blue's health care providers or one or more particular providers ("Estimated Price"), or

(iii) an average price, determined by the Host Blue in accordance with BlueCard Policies, based on a billed charges discount representing the Host Blue's average savings expected after settlements, withholds, any other contingent payment arrangements and non-claims transactions for all of its providers or for a specified group of providers ("Average Price"). An Average Price may result in greater variation to the Employees and the Group from the Actual Price than would an Estimated Price.

Host Blues using either the Estimated Price or Average Price may, in accordance with BlueCard Policies, prospectively increase or reduce the Estimated Price or Average Price to correct for over– or underestimation of past prices. However, the amount paid by the Employees and Dependents is a final price and will not be affected by such prospective adjustment.

Statutes in a small number of states may require a Host Blue either (1) to use a basis for calculating Member coinsurance liability for covered health care services that does not reflect the entire savings realized, or expected to be realized, on a particular claim or (2) to add a surcharge. Should any state statutes mandate liability calculation methods that differ from the negotiated price methodology or require a surcharge, the Host Blue would then calculate an Employee's or

12

Dependent's coinsurance liability for any covered health care services in accordance with the applicable state statute in effect at the time the Member received those services.

**Return of Overpayments.** Under BlueCard, recoveries from a Host Blue or from participating providers of a Host Blue can arise in several ways, including, but not limited to, anti-fraud and abuse audits, provider/hospital audits, credit balance audits, utilization review refunds, and unsolicited refunds. In some cases, the Host Blue will engage third parties to assist in discovery or collection of recovery amounts. The fees of such a third party are netted against the recovery. Recovery amounts, net of fees, if any, will be applied in accordance with applicable BlueCard Policies, which generally required correction on a claim-by-claim or prospective basis.